*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

REPUBLICAN NATIONAL COMMITTEE,
MICHIGAN REPUBLICAN PARTY, and CINDY
BERRY,

        Plaintiffs-Appellees,

v

SECRETARY OF STATE and DIRECTOR OF
ELECTIONS,

        Defendants-Appellants.

FOR PUBLICATION
June 26, 2026
8:35 AM

No. 379136
Court of Claims
LC No. 24-000148-MZ

Before: BAZZI, P.J., and RICK and MALDONADO, JJ.

RICK, J.

This year, 2026, marks the 250th anniversary of the founding of the United States. Integral to the creation of the United States and the democracy upon which it stands is the right and duty to engage in public discourse by casting one's vote. As noted by founding father Thomas Jefferson, a functioning democracy and representative government requires an engaged electorate. In 1785, he wrote, "It has been thought that corruption is restrained by confining the right of suffrage to a few of the wealthier of the people: but it would be more effectually restrained by an extension of that right to such numbers as would bid defiance to the means of corruption."[1]

The right of a qualified electorate to vote must be safeguarded so as to preserve election integrity. As succinctly noted by the National Academy of Public Administration, a nonprofit and nonpartisan organization, this involves multifaceted considerations:

> Electoral integrity and voter participation are enhanced by (1) ensuring that everyone with a legal right to vote is able to do so; (2) protecting such critical

---

[1] Thomas Jefferson, *Notes on the State of Virginia, Query XIV*, reprinted in The Founders' Constitution, vol 1, ch 18, doc 16 (University of Chicago Press), available at <https://press-pubs.uchicago.edu/founders/documents/v1ch18s16.html> (accessed June 17, 2026).

election infrastructure as storage facilities, polling places, and centralized vote tabulation locations; and (3) safeguarding such information and communications technology as voter registration databases, voting machines, and other electoral management systems.[2]

In the instant case, the parties share the belief that the right to vote is critical to advancing democracy and representative government. They part ways regarding whether the right is properly safeguarded as required by law, by administrative directives issued by the Michigan Secretary of State. Those directives are relied upon by local elections officials who are responsible for tabulating votes in any given election. Defendants, the Secretary of State and the Director of Elections, appeal as of right the Court of Claims' final order and judgment granting summary disposition in favor of plaintiffs, the Republican National Committee, the Michigan Republican Party, and Chesterfield Township Clerk Cindy Berry. The Court of Claims held that MCL 168.768 prohibits the tabulation of absent-voter ballots returned with missing or mismatched ballot stubs. The Court of Claims entered a permanent injunction requiring defendants to implement a 10-step cure procedure until defendants promulgated a different rule. Because MCL 168.768 does not prohibit the tabulation of those ballots and because the Court of Claims granted permanent mandatory injunctive relief without making the required findings, we reverse and vacate the final order and judgment.

## I. FACTUAL BACKGROUND

This case concerns absent-voter ballots returned with a missing stub or with a stub number that did not match the number printed on the face of the absent-voter ballot return envelope. The Secretary's 2024 guidance instructed election inspectors to process those ballots as challenged ballots if the discrepancy could not be explained. The guidance also instructed inspectors to consult the qualified-voter-file absent-voter list as part of that review. If a ballot was missing its stub, the election inspector was to check whether the detached stub was inside the absent-voter ballot envelope. If it was not, the ballot was also to be processed as a challenged ballot.

Plaintiffs filed this action in September 2024, challenging defendants' guidance as inconsistent with MCL 168.768 of the Michigan Election Law and Article 2, § 4(1)(h), of Michigan's 1963 Constitution. The complaint did not challenge the handling of a particular ballot. Rather, plaintiffs challenged defendants' general statewide guidance permitting absent-voter ballots with missing or mismatched stubs to be tabulated as challenged ballots.

In September 2024, defendants moved for summary disposition under MCR 2.116(C)(7) (claim barred by operation of law), (8) (failure to state a claim upon which relief could be granted), and (10) (no genuine issue of material fact). In an October 2024 opinion and order, the Court of Claims denied defendants' motion for summary disposition in part and granted partial relief to plaintiffs under MCR 2.116(I)(1) (nonmoving party entitled to summary disposition). The court required defendants to revise the election manual to make clear that election inspectors must

---

[2] National Academy of Public Administration, *Protect Electoral Integrity and Enhance Voter Participation* <https://napawash.org/grand-challenges/protect-electoral-integrity-and-enhance-voter-participation> (accessed June 17, 2026).

compare the ballot-stub number to the number on the face of the absent-voter return envelope, while also allowing defendants to continue the existing practice of comparing the ballot-stub number with the number recorded in the qualified-voter-file absent-voter list as an additional step.

After the 2024 election, defendants again moved for summary disposition under MCR 2.116(C)(10). The same day, plaintiffs moved for summary disposition under MCR 2.116(I)(1) and additionally requested declaratory relief under MCR 2.605. Defendants argued that the guidance did not conflict with MCL 168.768 because the statute does not state what must happen when an absent-voter ballot has a missing or mismatched stub. Plaintiffs argued that MCL 168.768 authorizes preparation and tabulation only when the numbers match, and that the absence of matching numbers therefore required rejection. Plaintiffs also relied on a separate statutory rule governing in-person ballots, MCL 168.797a(2), which provides that if the ballot-stub number does not agree with the number recorded on the poll list, "the ballot must be marked as 'rejected', and the elector must not be allowed to vote."

In a December 2025 opinion and order, the Court of Claims denied defendants' motion, granted plaintiffs' motion in part, and concluded that there was no statutory authority to tabulate absent-voter ballots with missing or mismatched stubs. The court directed the parties to submit supplemental briefs addressing what should be done with such ballots and envelopes and what procedures, if any, should be followed to allow affected voters an opportunity to cure.

Defendants' supplemental brief maintained their disagreement with the court's statutory ruling and argued that, if the court's ruling stood, defendants should be allowed time to promulgate a rule governing any necessary cure process. Alternatively, defendants suggested that affected ballots could be handled under existing provisional-ballot procedures. Plaintiffs proposed a 10-step cure procedure. The Court of Claims then directed plaintiffs to submit a proposed order adopting their proposed remedy as a final injunction and declaratory judgment. Plaintiffs' proposed order was the first filing in which plaintiffs expressly requested permanent injunctive relief.

On December 29, 2025, the Court of Claims entered plaintiffs' proposed order verbatim as its final order and judgment. The order declared that MCL 168.768 requires the board of election inspectors to compare the ballot number on the ballot stub with the number on the face of the return envelope and to tabulate the ballot only if those numbers match. The order further declared that the board of election inspectors has no statutory authority to tabulate an absent-voter ballot with a missing or mismatched stub, whether as a challenged ballot or otherwise. The court then entered a permanent injunction requiring defendants to adopt plaintiffs' 10-step cure procedure unless and until defendants promulgated a new rule creating an alternative cure procedure. This appeal followed.

## II. ANALYSIS

### A. STANDARDS OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition. *True Care Physical Therapy, PLLC v Auto Club Group Ins Co*, 347 Mich App 168, 175; 14 NW3d 492 (2023). We also review de novo questions of statutory interpretation and constitutional law.

-3-

*Farmington v Farmington Survey Comm*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 372022); slip op at 3.

We review a trial court's decision to grant permanent injunctive relief for an abuse of discretion. *Dep't of Environmental Quality v Gomez*, 318 Mich App 1, 32; 896 NW2d 39 (2016). A court abuses its discretion when its ruling falls "outside the range of reasonable and principled outcomes." *Id*. at 33-34. "A trial court necessarily abuses its discretion when it makes an error of law." *Danhoff v Fahim*, 513 Mich 427, 442; 15 NW3d 262 (2024) (quotation marks and citation omitted).

## B.  MCL 168.768

Defendants first argue that the Court of Claims erred by reading MCL 168.768 to prohibit the tabulation of absent-voter ballots with missing or mismatched stubs.  We agree.

The Michigan Constitution guarantees every registered elector "[t]he right . . . to vote an absent voter ballot without giving a reason, during the forty (40) days before an election, and the right to choose whether the absent voter ballot is applied for, received and submitted in person or by mail."  Const 1963, art 2, § 4(1)(h).  The Constitution also requires "a state-funded system" to "inform voters of any deficiency with the voter's submitted absent voter ballot application or absent voter ballot, and provide instructions for addressing any such deficiency."  Const 1963, art 2, § 4(1)(i).

When a clerk receives an absent-voter ballot in a return envelope, the clerk must first determine whether the elector is registered in the jurisdiction and whether the signature on the return envelope agrees sufficiently with the signature on file.  MCL 168.766(1).  Once a ballot is approved for tabulation, it is delivered to the entity responsible for processing and tabulating it.  MCL 168.765(1), (4), and (5).  For election-day precinct processing, MCL 168.768 provides:

> The board of election inspectors shall verify that there is an elector's signature on the absent voter ballot return envelope and that the statement on the absent voter ballot return envelope that the ballot is approved for tabulation is complete.  If the elector's signature is missing or the statement that the absent voter ballot is approved for tabulation is incomplete, the board of election inspectors must immediately contact the city or township clerk.  If the elector's signature is present and the statement that the absent voter ballot is approved for tabulation is complete, the board of election inspectors shall open the absent voter ballot return envelope, take out the ballot, and, without unfolding the ballot, compare the ballot number on the ballot stub with the ballot number on the face of the absent voter ballot return envelope.  If the ballot numbers match, the board of election inspectors shall detach the perforated numbered stub and prepare the ballot for tabulation, as directed by the secretary of state.  Each ballot must be inserted into the tabulator.  One of the election inspectors shall enter the elector in the poll book as having cast an absent voter ballot.

When an absent-voter counting board processes ballots, it must process the ballots and returns in as nearly as possible the same manner as ballots are processed in election-day precincts.

MCL 168.765a(6). Absent-voter ballots processed before election day must be processed and tabulated in the same manner and under the same requirements as absent-voter ballots processed and tabulated on election day. MCL 168.765a(13). The Legislature also requires clerks and election inspectors to follow the Secretary's instructions and procedures regarding the processing and tabulation of absent-voter ballots, and it specifically directs the Secretary to issue binding instructions for absent-voter counting boards. MCL 168.765a(13) and (17).

In contrast, MCL 168.797a(2) governs the processing of ballots cast by in-person voters. The statute requires an election inspector to compare the ballot-stub number with the number recorded on the poll list. It then states that, with exceptions not relevant here, if those numbers do not agree, "the ballot must be marked as 'rejected', and the elector must not be allowed to vote." MCL 168.797a(2). That express rejection language does not appear in MCL 168.768.

The primary goal of statutory interpretation is to give effect to the Legislature's intent. *Petersen v Magna Corp*, 484 Mich 300, 307; 773 NW2d 564 (2009). Interpretation begins with a review of the statutory language. *McQueer v Perfect Fence Co*, 502 Mich 276, 286; 917 NW2d 584 (2018). If statutory language is unambiguous, courts must apply it as written. *Id*. However, "[a] statutory term or phrase cannot be viewed in isolation, but must be construed in accordance with the surrounding text and the statutory scheme." *Id*. (quotation marks and citation omitted). Statutes addressing the same subject or sharing a common purpose are read together and must be harmonized if possible. *O'Connell v Dir of Elections*, 316 Mich App 91, 99; 891 NW2d 240 (2016).

The Court of Claims treated the phrase "*[i]f* the ballot numbers match," MCL 168.768 (emphasis added), as though it said "*only* if the ballot numbers match." But MCL 168.768 does not contain that limiting language. Considered in isolation, the conditional phrase could support plaintiffs' interpretation. It directs election inspectors what to do when the numbers match: detach the perforated numbered stub and prepare the ballot for tabulation as directed by the Secretary. The following sentence, however, states that "[e]ach ballot must be inserted into the tabulator." MCL 168.768. Read together, those sentences support defendants' interpretation that a ballot may still be tabulated when the stub is missing or mismatched. MCL 168.768 does not state what must happen when the numbers do not match. Nor does it mention the situation in which a voter returns an otherwise approved absent-voter ballot without the stub attached. Because the provision is capable of more than one reasonable interpretation when applied to missing or mismatched stubs, it is ambiguous and must be construed in the context of the Michigan Election Law as a whole.

The Legislature's treatment of in-person ballots resolves the ambiguity. In MCL 168.797a(2), the Legislature provided that an in-person ballot with a mismatched ballot-stub number must be marked rejected and the elector must not be allowed use that ballot to vote. MCL 168.768 and MCL 168.797a(2) both address ballot-stub comparisons during the processing of ballots. Both provisions are part of the Michigan Election Law, and both were included in the same recent amendments to that statutory scheme. See 2023 PA 81. They must therefore be read together. See *O'Connell*, 316 Mich App at 99.

When the Legislature intended a ballot-stub mismatch to require rejection, it said so expressly. It did not include comparable language in MCL 168.768. Had the Legislature intended to impose the same mandatory-rejection rule on absent-voter ballots, it could have amended

MCL 168.768 to say so. It did not. Reading the provisions together, the difference in wording indicates that the Legislature did not prohibit election inspectors from tabulating absent-voter ballots with missing or mismatched stubs. That distinction also makes practical sense. When a stub mismatch is discovered while an elector is present at the polls, the ballot may be spoiled in the elector's presence and the elector may be issued a replacement ballot. But once an absent-voter ballot has been returned and separated from the voter, that same corrective process is no longer available. The Legislature's decision not to impose mandatory rejection in that circumstance is therefore consistent with the different procedures governing absent-voter ballots.

Plaintiffs contend that the negative-implication canon requires the opposite conclusion. "Under the negative-implication canon of statutory construction, the express mention of one thing implies the exclusion of other similar things." *Daher v Prime Healthcare Servs-Garden City, LLC*, 515 Mich 254, 280; 29 NW3d 136 (2024) (quotation marks, citation, and alteration omitted). According to plaintiffs, because MCL 168.768 says that election inspectors "shall detach" the stub and prepare the ballot for tabulation if the numbers match, election inspectors necessarily lack authority to tabulate the ballot if the numbers do not match or if the stub is missing. That argument gives too much weight to one conditional phrase and too little weight to the statutory context as a whole. The negative-implication canon is a tool for discerning legislative intent, not a license to add a prohibition that the Legislature omitted from one provision while expressly including it in a neighboring provision addressing a closely related processing requirement.

The surrounding language is also consistent with that conclusion. MCL 168.768 states that "[e]ach ballot must be inserted into the tabulator." At minimum, that sentence does not supply the mandatory-rejection rule that plaintiffs ask us to infer from the preceding conditional clause. Reading the provision as a whole, MCL 168.768 identifies the ordinary procedure when ballot numbers match but does not prescribe rejection when the numbers do not match or when the stub is missing.

We do not hold that MCL 168.768 is irrelevant when a stub is missing or mismatched. The statute requires election inspectors to compare the ballot number on the stub with the number on the face of the absent-voter ballot return envelope. If the numbers match, the statute identifies the ordinary next steps. If the numbers do not match, or if there is no attached stub to compare, the discrepancy may justify additional safeguards. The Secretary's challenged-ballot instruction supplies such a safeguard by preserving the vote for tabulation while identifying the ballot as challenged and recoverable in the event of an election contest.

Although the Secretary's guidance does not control our interpretation of MCL 168.768, we must nevertheless recognize the Secretary's statutory role. The Secretary is Michigan's chief election officer and exercises "supervisory control over local election officials in the performance of their duties . . . ." MCL 168.21. The Secretary must "issue instructions and promulgate rules" to conduct elections. MCL 168.31(1)(a). The Secretary also must "[a]dvise and direct local election officials as to the proper methods of conducting elections." MCL 168.31(1)(b). Because the Legislature required a comparison but did not prescribe rejection or any other consequence for a discrepancy, the Secretary may issue instructions addressing how election inspectors should proceed, provided those instructions remain consistent with the Michigan Election Law. See *In re Complaint of Rovas*, 482 Mich 90, 99-100; 754 NW2d 259 (2008). The challenged guidance does not conflict with MCL 168.768. The guidance still requires election inspectors to perform the

comparison required by statute. It also identifies what to do when the comparison reveals an unexplained discrepancy or when a stub is missing. Because MCL 168.768 does not require rejection in those circumstances, the guidance does not disregard the statute by allowing the ballot to be processed as challenged.

Plaintiffs also rely on MCL 168.765a(6), which requires absent-voter counting boards to "process the ballots and returns in as nearly as possible the same manner as ballots are processed in election day precincts." That provision does not incorporate MCL 168.797a(2)'s rejection rule for in-person ballots into the absent-voter process. MCL 168.765a(6) requires absent-voter counting boards to use, to the extent possible, the same manner of processing absent-voter ballots that election-day precincts use for absent-voter ballots. It does not erase the Legislature's choice to treat absent-voter ballots in MCL 168.768 and in-person ballots in MCL 168.797a under distinct statutory provisions.

The constitutional background also counsels against reading an unstated rejection rule into MCL 168.768. The Michigan Constitution now expressly protects the right to vote by absent-voter ballot and provides instructions for addressing deficiencies. Const 1963, art 2, § 4(1)(h) and (i). Those constitutional protections reinforce our reluctance to infer a mandatory-rejection rule that the Legislature did not state. We need not decide whether a particular stub discrepancy constitutes a "deficiency" within the meaning of Const 1963, art 2, § 4(1)(i), or what cure procedure that provision may require in other circumstances. We therefore hold that MCL 168.768 does not prohibit election inspectors from tabulating absent-voter ballots with missing or mismatched stubs as challenged ballots under the Secretary's guidance. The Court of Claims erred by declaring that such ballots cannot be tabulated and by granting summary disposition to plaintiffs on that basis.

C. PERMANENT INJUNCTION

Defendants also argue that the court abused its discretion by imposing plaintiffs' 10-step cure procedure. We agree.

Permanent injunctive relief is an extraordinary remedy. *Wiggins v City of Burton*, 291 Mich App 532, 558; 805 NW2d 517 (2011). A court may issue a permanent injunction "only when justice requires, there is no adequate remedy at law, and there exists a real and imminent danger of irreparable injury." *Youmans v Bloomfield Twp*, 336 Mich App 161, 221; 969 NW2d 570 (2021). "[T]he party seeking injunctive relief has the burden of demonstrating that the requested injunction is appropriate and necessary." *Id*. An injunction must also be "tailored to the facts of the particular case." *Janet Travis, Inc v Preka Holdings, LLC*, 306 Mich App 266, 274; 856 NW2d 206 (2014).

The Court of Claims sua sponte issued a mandatory injunction rather than a prohibitory one. It affirmatively required defendants to implement a detailed statewide cure process. Permanent injunctive relief of that kind required proof of an actual or threatened invasion of rights and an order setting forth the reasons for its issuance with specificity. See *Barkau v Ruggirello*, 100 Mich App 617, 623; 300 NW2d 342 (1980); MCR 3.310(C). The Court of Claims did not make those findings. The court initially asked the parties to brief what should be done with affected ballots and what procedures, if any, should permit an affected elector to cure. The court

did not ask the parties to brief the standards for permanent injunctive relief. Plaintiffs did not request permanent injunctive relief in their complaint, their motion for summary disposition, or their supplemental remedy brief. The first express request for permanent injunctive relief appeared in plaintiffs' proposed order, which the court adopted. Defendants therefore did not receive a meaningful opportunity to address whether plaintiffs could satisfy the equitable requirements for permanent injunctive relief before the court imposed a mandatory statewide procedure.

Further, the adopted findings did not establish the required elements. That task would be practically impossible, given the court did not hold an evidentiary hearing. The court's order stated that injunctive relief was necessary to effectuate the court's statutory ruling and to ensure that affected voters were not disenfranchised. It stated that voters whose absent-voter ballots were rejected because of a missing or mismatched stub may be disenfranchised without a meaningful cure opportunity. But the court did not find that plaintiffs faced a real and imminent danger of irreparable injury. It also did not determine whether plaintiffs lacked an adequate remedy at law or explain why declaratory relief or a narrower remedy would be insufficient.

Those omissions are dispositive. The case was not brought by a voter whose ballot had been rejected because of a missing or mismatched stub. Plaintiffs challenged statewide guidance before the court had evidence that any identified voter would imminently suffer disenfranchisement under a post-judgment regime. The possibility that voters may be affected in a future election is not the same as a finding of real and imminent irreparable injury. As this Court has explained, "the mere apprehension of future injury" is insufficient to justify injunctive relief. *Hopkins Twp v State Boundary Comm*, 340 Mich App 669, 698; 988 NW2d 1 (2022).

Nor did the court adequately tailor the injunction to the record. The court adopted a complex election-administration process proposed by one side without holding an evidentiary hearing and without resolving the practical and legal questions defendants and amici later identified. Those concerns included (1) whether some parts of the procedure conflicted with existing statutory limits on electronic ballot return; (2) whether boards of county canvassers could tabulate newly cast cured ballots during the canvass; (3) whether post-election voting would be lawful; and (4) whether all clerks had access to the equipment necessary to comply with the ordered on-demand-ballot process. We express no final view on those questions, but their existence underscores why a court must make findings and tailor relief before imposing a mandatory statewide election procedure. Because the Court of Claims imposed permanent injunctive relief without making the required finding of irreparable injury, the court abused its discretion. We therefore need not address the parties' remaining arguments concerning the operation of the 10-step cure procedure. The permanent injunction must be vacated.

III. CONCLUSION

MCL 168.768 requires election inspectors to compare the number on an absent-voter ballot stub with the number on the face of the absent-voter ballot return envelope. Read in context and together with MCL 168.797a(2), it does not prohibit tabulation when a stub is missing or mismatched, and it does not require the rejection of an absent-voter ballot in those circumstances. The Secretary's guidance allowing those ballots to be processed as challenged ballots likewise does not conflict with MCL 168.768. The Court of Claims therefore erred by granting summary disposition to plaintiffs and by declaring the Secretary's guidance contrary to law. The Court of

Claims also abused its discretion by imposing permanent injunctive relief without finding a real and imminent danger of irreparable injury.

We reverse the Court of Claims' final order and judgment, vacate the permanent injunction, and remand for entry of a judgment in favor of defendants. We do not retain jurisdiction.

/s/ Michelle M. Rick
/s/ Mariam S. Bazzi
/s/ Allie Greenleaf Maldonado